UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SUSAN SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01905-JPH-MPB |
| | ) | |
| MARION COMMUNITY SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

After working as a bus driver for Marion Community Schools ("MCS") for over a year, Susan Scott was fired.  Ms. Scott has brought claims against MCS under Title VII for retaliation and hostile work environment, and MCS has filed a motion for summary judgment on both claims. Dkt. [45].  For the reasons below, that motion is **GRANTED.**

**I.**
**Facts and Background**

Because MCS has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, because Ms. Scott has not challenged most of the facts designated by MCS, the Court will accept those facts as admitted without controversy.  *See* S.D. Ind. L. R. 56-1(f) ("In deciding a summary judgment motion, the court will assume that[] . . . the facts as claimed and supported by admissible evidence

1

by the movant are admitted without controversy except to the extent that[] the non-movant specifically controverts the facts . . . with admissible evidence . . . ."); *see Smith v. Severn*, 129 F.3d 419, 425–26 (7th Cir. 1997) (noting that "the non-moving party's failure to contest the moving party's [facts]" "[r]educ[es] the pool from which [reasonable] inferences may be made" in the non-moving party's favor).

Ms. Scott started as a bus driver for MCS in July 2017.  Dkt. 45-7 at 1 ¶ 5 (Preston Aff.).  The next month, as Ms. Scott and bus aide Sandra Hayes walked by bus driver Michael Yoder, he said, "There is a Twinkie," referring to either Ms. Scott or her yellow truck.  Dkt. 45-1 at 21, 57–58, 75 (Scott Dep. 53:10–22, 91:1–92:14, 111:7–8).  When Ms. Scott told him to stop calling her that, he grabbed his crotch and said, "It depends on what type of cream filling you want."  *Id.* at 21, 57–58 (53:10–22, 91:1–92:14).  She told him, "That is not nice" and walked off.  *Id.* at 58 (92:11–14).

A few weeks later, Mr. Yoder drove up behind Ms. Scott while she was walking with Ms. Hayes, revved his engine, and said something like, "Nice day to run someone over."  *Id.* at 24, 26, 61–62 (56:12–18, 58:7–12, 95:22–96:3).  Ms. Scott felt threatened by Mr. Yoder's conduct.  *Id.* at 24, 26 (56:25, 58:15–19).

In September 2017, as Ms. Scott spoke about her family members with the last name "Hiatt"—Ms. Scott's maiden name—with a colleague, Mr. Yoder walked in and said that he had once had a date at the Hyatt.  *Id.* at 43–46 (77:19–80:4).  Then, in October, Ms. Scott took on an extra mid-day bus run

for additional pay. *Id.* at 5, 75–76 (35:14–25, 111:23–112:13); dkt. 45-8 at 1–2 ¶ 6 (Richey Aff.). Other bus drivers, including Mr. Yoder, questioned her about why she had received the extra bus run, which they said should have gone to a driver with more seniority. Dkt. 45-1 at 76–85 (Scott Dep. 112:12–121:3).

Sometime in the fall of 2017, Mr. Yoder substituted for Ms. Scott on her bus route. *Id.* at 66–67 (100:15–101:12). When Ms. Scott returned, the students told her that Mr. Yoder said that he planned to speak with David Khalouf—MCS' Director of Operations, dkt. 45-6 at 1 ¶¶ 3–4 (Khalouf Aff.)—to change Ms. Scott's pick-up times, dkt. 45-1 at 66–67 (Scott Dep. 100:15–101:12).[1] MCS never changed Ms. Scott's pick-up times. *Id.* at 74 (110:2–9).

In January 2018, Dale Beck—a fellow bus driver—parked in the spot Ms. Scott normally parked her bus. *Id.* at 88–98 (124:7–134:15). After the second day he parked there, Ms. Scott asked Mr. Beck about it, and he said, "We don't have designated spots." *Id.* at 95–96, 97 (131:19–132:3, 133:17–21). Ms. Scott said she had been told by another bus driver that she could not park in a spot different from her normal one. *Id.* at 98 (134:1–10).

On three mornings in January, Ms. Scott found that her bus battery was dead and suspected that someone intentionally turned the bus key in the ignition to cause the battery to drain. *Id.* at 99–104 (135:10–140:23).

---

[1] This order does not consider whether any of the cited statements constitute hearsay because neither party has raised a hearsay objection to their use on summary judgment. *See Lockwood v. McMillan*, 237 F. Supp. 3d 840, 852 n.3 (S.D. Ind. 2017) ("[T]he Court will not address a potential hearsay issue absent a specific objection.").

Sometime shortly before March 12, 2018, as Ms. Scott sat in a break room with other bus drivers, Mr. Yoder asked her how much money she made. *Id.* at 26–27, 105–07, 110–11 (58:20–59:4, 141:12–143:15, 146:18–147:23). Mr. Yoder's wife, who is also a bus driver, told Ms. Scott that she was "stepping on people's feet" and asked why she "did not drive a bus route for a school corporation closer to home." *Id.* at 10, 26–27 (40:11–19, 58:20–59:8).

On March 12, Ms. Scott met with Mr. Khalouf to complain about Mr. Yoder's behavior. *Id.* at 21 (53:5–9); dkt. 45-6 at 1–2 ¶ 5 (Khalouf Aff.). MCS had never before received a complaint from another employee about Mr. Yoder "behaving inappropriately or discriminatorily toward a female coworker because of her sex." Dkt. 45-6 at 2 ¶ 6 (Khalouf Aff.); dkt. 45-7 at 2 ¶ 7 (Preston Aff.). At the end of the meeting, Mr. Khalouf said he would talk to Mr. Yoder and tell him to stay away from Ms. Scott. Dkt. 45-1 at 27–28 (Scott Dep. 59:24–60:7).

Two days later, Mr. Yoder came up within "an inch behind" Ms. Scott as she walked through the employee breakroom, flicked her purse strap off her shoulder, and asked her how far it was to her house. *Id.* at 28–31, 116–123 (60:8–63:20, 152:3–159:5). That same day, Ms. Scott told Mr. Khalouf about the incident. *Id.* at 28–33, 116–123 (60:8–65:9, 152:3–159:5); dkt. 45-6 at 2 ¶ 7 (Khalouf Aff.). After a week off for spring break, dkt. 45-7 at 6 ¶ 16 (Preston Aff.), Mr. Khalouf spoke with Mr. Yoder on April 3 about the complaints and directed him to stay away from Ms. Scott, dkt. 45-6 at 2 ¶ 8 (Khalouf Aff.).

Also on April 3, Mr. Yoder substituted for Ms. Scott on her bus route because she was absent. Dkt. 45-1 at 34 (Scott Dep. 66:1–23). When Ms. Scott returned to her route the next day, her bus riders told her that Mr. Yoder had called her "an idiot" and said that she didn't "know how to drive" and "break[s] the rules by letting kids stand up while her bus is moving." *Id.* After reaching the school bus hub but while students were still on board, Ms. Scott called Mr. Khalouf and asked him to meet her on the bus. *Id.* at 36 (68:1–13). When he arrived, Ms. Scott started recounting the story, but Mr. Khalouf told her that he did not want to "hash out her complaint" on the bus. *Id.*; dkt. 45-6 at 2–3 ¶ 9 (Khalouf Aff.). Ms. Scott responded that she wanted to do it on the bus because the children witnessed Mr. Yoder's behavior. *Id.* But Mr. Khalouf again told her that he did not want to "hash this out in front of the children." *Id.*

Mr. Khalouf investigated Ms. Scott's complaint by watching the April 3 bus video but did not hear or see the behavior Ms. Scott alleged. Dkt. 45-6 at 3 ¶ 10 (Khalouf Aff.). Mr. Khalouf also watched the April 4 video of Ms. Scott's route and saw that Ms. Scott instructed the children to have their parents call the bus barn and write complaint letters because MCS would not "take [her] word for it." *Id.* at 3 ¶ 11. The video showed Ms. Scott telling the children that she wished they had "told [Mr. Yoder] off" because she had "turned him in a few days ago." *Id.* The video also showed Ms. Scott instructing a student to write down what the other children were saying. *Id.*; dkt. 45-1 at 34–35, 130–33 (Scott Dep. 66:24–67:25, 166:2–169:3).

5

On April 10, Mr. Khalouf met with Mr. Yoder again, and Mr. Yoder assured him that he had not spoken to Ms. Scott in weeks and had tried to avoid her. Dkt. 45-6 at 3 ¶ 12 (Khalouf Aff.). Later that day, Mr. Khalouf met with Ms. Scott to discuss the April 4 incident. Dkt. 45-1 at 36–39 (Scott Dep. 68:14–70:22); dkt. 45-6 at 3–4 ¶ 13 (Khalouf Aff.). During this conversation, Mr. Khalouf said Ms. Scott had behaved "childishly" and that she "should [not] be pulling the kids into it" because they could be "easily swayed and manipulated by her" as their regular bus driver. *Id.*

On April 19, Ms. Scott met with MCS' Director of Human Resources, Shelly Preston, and Assistant Superintendent, Dr. Robert Shultz, to discuss her complaints. Dkt. 45-1 at 46–47 (Scott Dep. 80:5–81:9); dkt. 45-7 at 1–2 ¶ 6 (Preston Aff.). Ms. Scott brought a list of harassing or intimidating behavior done by coworkers. Dkt. 45-1 at 47–49 (Scott Dep. 81:10–83:17); dkt. 45-2 (Scott Notes); dkt. 45-7 at 1–2 ¶ 6 (Preston Aff.), 7–26. For around 90 minutes, they discussed Ms. Scott's complaints, with Ms. Preston reading through each page of the chronology and asking questions. Dkt. 45-1 at 49–50 (Scott Dep. 83:18–84:13); dkt. 45-3 (Meeting Notes). Ms. Scott shared details about each incident except the "Hyatt" comment. Dkt. 45-1 at 56–62, 74–75, 105–24 (Scott Dep. 90:14–96:2, 110:16–111:12, 141:12–160:5). Ms. Preston asked Ms. Scott to provide her with witness names, and she said Sandra Hayes. *Id.* at 133 (169:4–10). At the end of the meeting, Ms. Preston told Ms. Scott that she would investigate her claims. *Id.*

The next week, Ms. Preston met separately with Mr. Yoder and Ms. Hayes.  Dkt. 45-7 at 2–4 ¶¶ 8–9 (Preston Aff.), 29–32.  Mr. Yoder denied that most of the alleged events happened and disputed facts for others, and Ms. Preston directed him to avoid personal communications with Ms. Scott "to avoid any misinterpretation of verbal or nonverbal communications with her." *Id.* at 2–3 ¶ 8 (Preston Aff.), 29, 31.  Ms. Hayes denied witnessing inappropriate actions or harassing comments toward Ms. Scott.  *Id.* at 3–4 ¶ 9 (Preston Aff.), 32.

On May 7, Ms. Preston met with Ms. Scott again and explained that she could not substantiate her claims and that Ms. Scott should avoid communicating with Mr. Yoder unless required for work.  Dkt. 45-1 at 138–39 (Scott Dep. 177:4–178:22); dkt. 45-7 at 5 ¶ 11 (Preston Aff.).  Ms. Scott responded that she had filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  Dkt. 45-1 at 139–40 (Scott Dep. 178:23–179:3).

When school restarted for the 2018–19 school year, Ms. Scott expressed interest in transferring her regular bus route to one of two open bus routes and in taking on extra mid-day drives.  Dkt. 45-6 at 7–9 ¶¶ 22, 24 (Khalouf Aff.).  However, MCS had recently changed its method for selecting drivers for these opportunities to focus more on seniority in selection.  *Id.* at 6–8 ¶¶ 19–22 (Khalouf Aff.); dkt. 45-8 at 2 ¶ 7 (Richey Aff.).  As a result, MCS assigned these routes and extra mid-day runs to drivers who had more seniority than Ms. Scott.  Dkt. 45-6 at 7–9 ¶¶ 22–25 (Khalouf Aff.); dkt. 45-1 at 183–84 (Scott

Dep. 336:24–337:4).  Twenty-nine drivers with more seniority than Ms. Scott also did not receive extra mid-day bus runs.  Dkt. 45-6 at 9 ¶ 26 (Khalouf Aff.).

On Ms. Scott's November 13, 2018 afternoon route, she argued with children on her bus, telling them to "shut up" and praising a child who told the other riders to "[s]hut the hell up."  Dkt. 45-1 at 164 (Scott Dep. 283:1–13); dkt. 45-6 at 10 ¶ 28 (Khalouf Aff.); dkt. 45-10 (Bus Video); dkt. 45-8 at 3–4 ¶ 10 (Richey Aff.).  This violated MCS policy requiring drivers to speak "in a courteous manner" without "show[ing] anger" and its instructions "not [to] argue with students who challenge . . . authority."  Dkt. 45-6 at 11 ¶ 32 (Khalouf Aff.), 43.  During that drive, Ms. Scott also used her cellphone while driving and failed to look both ways before crossing a railroad track.  *Id.* at 10 ¶ 28 (Khalouf Aff.); dkt. 45-10 (Bus Video); dkt. 45-1 at 156–58 (Scott Dep. 275:23–277:12); dkt. 45-8 at 3 ¶ 10 (Richey Aff.).  MCS policy prohibits both actions.  Dkt. 45-6 at 10–11 ¶¶ 30–31 (Khalouf Aff.), 15–16.

On November 14, students on Ms. Scott's bus route complained to MCS about her behavior the day before.  *Id.* at 10 ¶ 29.  After reviewing the bus video, Mr. Khalouf consulted with Ms. Preston, and they decided to terminate Ms. Scott.  *Id.* at 11 ¶¶ 33–34.  They fired Ms. Scott on November 16.  *Id.* at 11 ¶ 34; dkt. 45-9 (Meeting Transcript); dkt. 45-1 at 156–57 (Scott Dep. 275:9–25); dkt. 45-4 (Termination Letter).

On May 10, 2019, Ms. Scott filed a *pro se* complaint against MCS alleging Title VII violations for retaliation and a hostile work environment.  Dkt. 1.  MCS has moved for summary judgment on both claims.  Dkt. 45.

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

## III.
## Analysis

### A. Retaliation

Title VII prohibits an employer from retaliating against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" conducted under Title VII. 42 U.S.C. § 2000e–3(a). To survive summary judgment on her retaliation claim, Ms. Scott must show that a reasonable jury could find that "1) [s]he engaged in a statutorily protected activity;  2) [s]he suffered an adverse

employment action; and 3) there is a 'but for' causal connection between 1 and 2." *Marshall v. Ind. Dep't of Correction*, 973 F.3d 789, 793 (7th Cir. 2020).

MCS argues that Ms. Scott has not designated evidence that her protected activity was a but-for cause of an adverse employment action. Dkt. 47 at 35. Ms. Scott has not expressly addressed this argument. *See* dkt. 55.

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). This means that, at trial, a plaintiff would have to show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

Ms. Scott filed an EEOC complaint in May 2018, dkt. 45-1 at 180 (Scott Dep. 333:5–10), which is a protected activity, *see Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). After that, she suffered three adverse employment consequences. First, Ms. Scott did not receive the extra mid-day bus runs that she requested near the start of the 2018–19 school year. Dkt. 45-6 at 7–9 ¶¶ 22–25 (Khalouf Aff.); dkt. 45-1 at 183–84 (Scott Dep. 336:24–337:4); *see Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (holding that "a denial of overtime is an adverse employment action sufficient to implicate Title VII"). Second, she did not receive the new bus routes that she

also requested.[2] Dkt. 45-6 at 7–8 ¶ 22 (Khalouf Aff.).  And third, MCS terminated her employment.  *Id.* at 11 ¶ 34; dkt. 45-4 (Termination Letter).

### 1.  Denial of More Bus Runs and New Routes

Near the start of the 2018–19 school year, Ms. Scott expressed interest in transferring her regular bus route to one of two open bus routes and in taking on extra mid-day drives.  Dkt. 45-6 at 7–8 ¶¶ 22, 24 (Khalouf Aff.).  Although MCS had given Ms. Scott extra mid-day drives the previous school year, dkt. 45-1 at 5, 75–76 (Scott Dep. 35:14–25, 111:23–112:13); 45-8 at 1–2 ¶ 6 (Richey Aff.), MCS changed its selection method for selecting drivers to place greater importance on seniority for the 2018–19 school year, dkt. 45-6 at 6–7 ¶¶ 19–22 (Khalouf Aff.); dkt. 45-8 at 2 ¶ 7 (Richey Aff.).  As a result, MCS assigned these open routes and extra mid-day runs to drivers who had more seniority than Ms. Scott.  Dkt. 45-6 at 7–9 ¶¶ 22–25 (Khalouf Aff.); dkt. 45-1 at 183–84 (Scott Dep. 336:24–337:4).  Eleven drivers with more seniority than Ms. Scott received extra mid-day runs during the 2018–19 school year, and twenty-nine drivers with more seniority than Ms. Scott also did not receive extra mid-day bus runs.  Dkt. 45-6 at 8–9 ¶¶ 24–26 (Khalouf Aff.).

MCS has thus designated evidence showing that seniority—and not Ms. Scott's EEOC complaint—was the reason it did not grant her requests for a new route and extra mid-day bus runs.  Ms. Scott has not designated any

---

[2] Although it's unclear whether Ms. Scott's "denial of a transfer" to open bus routes is an "adverse employment action," *see Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634–35 (7th Cir. 2013), this order does not decide that question because it grants MCS summary judgment on Ms. Scott's retaliation claim on other grounds.

evidence casting doubt on this explanation or otherwise connected her EEOC complaints to MCS' decision not to award her the new bus routes. As a result, no reasonable jury could find that MCS did not give her a new route and/or extra mid-day runs in retaliation for her having filed an EEOC charge.

### 2. Ms. Scott's Termination

MCS contends that it terminated Ms. Scott's employment because of her misconduct on November 13, 2018. *See* dkt. 47 at 36. MCS first argues that Ms. Scott acted unprofessionally when she yelled at students on the bus, told them to shut up, and encouraged a student to tell other students to shut up. *See id.* at 17. Second, MCS contends that Ms. Scott violated safety rules when she failed to look both ways before crossing a railroad track and when she used her cell phone while driving. *See id.* at 17–18. After reviewing the November 14, 2018 video of Ms. Scott's bus, Mr. Khalouf and Ms. Preston decided to terminate Ms. Scott at a November 16 meeting, citing these violations. Dkt. 45-6 at 11 ¶¶ 33–34 (Khalouf Aff.); dkt. 45-9 (Meeting Transcript); dkt. 45-1 at 156–58 (Scott Dep. 275:9–277:12); dkt. 45-4 (Termination Letter).

The video shows Ms. Scott arguing with children on her bus, telling them to "shut up" and praising a child who told the other riders to "[s]hut the hell up." Dkt. 45-1 at 164 (Scott Dep. 283:1–13); dkt. 45-10 (Bus Video). Those actions violated MCS' policies requiring drivers to speak "in a courteous manner" without "show[ing] anger" and its instructions "not [to] argue with students who challenge . . . authority." Dkt. 45-6 at 11 ¶ 32 (Khalouf Aff.), 43.

Ms. Scott admits that the students "got [her] bullying them" but argues that her actions were necessary because she needed to hear the radio and sirens. *See* dkt. 45-1 at 163–64 (Scott Dep. 282:1–283:13). However, MCS had previously warned Ms. Scott about its expectations of professional behavior around students. *See id.* at 36–39 (68:14–70:22); dkt. 45-6 at 3–4 ¶ 13 (Khalouf Aff.) (Mr. Khalouf had explained to Ms. Scott that she had acted "inappropriate[ly]" and that she "should [not] be pulling the into her issues" because they could be "easily swayed and manipulated by her").

The video also shows Ms. Scott using her cellphone while driving and failing to look both ways before crossing a railroad track. Dkt. 45-10 (Bus Video); dkt. 45-1 at 156–58 (Scott Dep. 275:23–277:12). MCS policy prohibits both actions. Dkt. 45-6 at 10–11 ¶¶ 30–31 (Khalouf Aff.), 15–16. And MCS has designated evidence that it has terminated other bus drivers for similar safety violations. *See id.* at 12 ¶¶ 36–37 (Khalouf Aff.), 69–72 (listing two other MCS drivers terminated for cell-phone use).

MCS has thus offered evidence that it fired Ms. Scott for legitimate, non-retaliatory reasons—"serious student safety concerns" and "unprofessional" behavior. *Id.* at 10 ¶ 29 (Khalouf Aff.). Either category of misconduct was a legitimate reason to terminate Ms. Scott. *See, e.g.*, *Sample v. Aldi Inc.*, 61 F.3d 544, 548–49 (7th Cir. 1995) (employee's "lack of professionalism" was a legitimate, nondiscriminatory reason for adverse employment actions); *Brown v. Bartholomew Cty. Court Servs.*, No. 1:13-CV-01824-RLY, 2015 WL 5553902, at *5 (S.D. Ind. Sept. 21, 2015) (holding that employee's safety policy violations

gave employer a legitimate, nondiscriminatory reason to terminate employment).  Ms. Scott has neither cast doubt on these stated justifications nor designated evidence linking her filing of an EEOC charge to her termination.  No reasonable jury could infer that her protected activity was a but-for cause of her termination.  MCS is entitled to summary judgment on Ms. Scott's retaliation claim.

### B. Hostile Work Environment

Title VII makes it unlawful for an employer to discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment, because of, among other things, the individual's sex. 42 U.S.C. § 2000e-2(a)(1).  This includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  To survive summary judgment on her hostile work environment claim, Ms. Scott must "present evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class . . . ; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018).

MCS argues that Ms. Scott has not offered evidence showing triable issues of fact for any of the required elements of her hostile work environment claim.  Dkt. 47 at 30.  Ms. Scott responds that she has proof of her claims. Dkt. 55 at 2.

### 1. Evidence Unrelated to Ms. Scott's Sex

MCS argues that many of Ms. Scott's negative work experiences are not relevant to her hostile work environment claim since they did not occur because of her sex.  Dkt. 47 at 32; *see Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (holding that "there must be *some* connection" "between the harassment and the plaintiff's protected class") (citation omitted) (emphasis in original).  Ms. Scott did not respond to this argument.  *See* dkt. 55.

These incidents of alleged harassment include:

- October 2017 questions from other bus drivers about why Ms. Scott received an extra bus run, which they said should have gone to a driver with more seniority.  *See* dkt. 45-1 at 76–85 (Scott Dep. 112:12-121:3).

- January 2018 incident when a fellow bus driver parked in her spot for two days.  *See id.* at 88–98 (124:7–134:15).

- January 2018 incident when Ms. Scott found her bus battery dead on three mornings.  *See id.* at 99–104 (135:10–140:23).

- March 2018 breakroom conversation with other bus drivers about how much money she made, and Ms. Yoder's comments about her "stepping on people's feet" by driving a bus route too far from home.  *See id.* at 10, 26–27, 105–07, 110–11 (40:11–19, 58:20–59:8, 141:12–143:15, 146:18–147:23).

Ms. Scott has not designated any evidence that these incidents occurred because of her sex. *See id.* at 82–83, 111, 119, 177–78 (118:23–119:3, 147:12–23, 155:7–23, 330:18–331:21). Indeed, Ms. Scott admitted that the behavior "wasn't because [she was] a woman" but was "based on the fact that [she] w[as] making more money" and was "the new driver." *Id.* at 111 (147:12–23); *id.* at 178 (331:20–21) (admitting "it is all about the money"). She agreed that she "believe[s] everything else [besides conduct relating to Mr. Yoder] was motivated by the fact [that she was] getting bus runs . . . [that the other drivers] believed should have been going to somebody else with more seniority." *Id.* at 82–83 (118:23–119:3). And although "harassment that might seem neutral in terms of [sex] . . . can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status," *Cole*, 838 F.3d at 896, that is not the case here. No other evidence ties these incidents to Ms. Scott's sex, and Ms. Scott admits they occurred for other reasons.

As in *Cole*, these incidents therefore cannot add support to a hostile work environment claim. 838 F.3d at 897. There, the Seventh Circuit found that plaintiff's evidence of incidents unrelated to race could not "raise a genuine factual dispute as to whether those events constitute race-based harassment," and considered only the evidence connected to race for the hostile work environment claim. *See id.*

Because Ms. Scott's designated evidence on these incidents similarly does not support a reasonable inference that this conduct was connected to

16

her sex, they are not relevant for her hostile work environment claim.  *See, e.g.*, *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (in discrimination cases, "[r]elevant evidence must be considered and irrelevant evidence disregarded.") (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

### 2.  Mr. Yoder's conduct

All remaining incidents relate to Mr. Yoder.  *See* dkt. 45-6 at 1–2 ¶ 5 (Khalouf Aff.).  These incidents include:

- August 2017 interaction where Mr. Yoder referred to Ms. Scott or her truck as a "Twinkie," grabbed his crotch, and asked "what type of cream filling [she] want[ed]."  Dkt. 45-1 at 21, 57–58, 75 (Scott Dep. 53:10–22, 91:1–92:14, 111:7–8).

- September 2017 incident when Mr. Yoder drove up behind Ms. Scott, revved his engine, and said something like, "Nice day to run someone over."  *Id.* at 24, 26, 61–62 (56:12–18, 58:7–12, 95:22–96:3).

- Mr. Yoder's September 2017 statement about Ms. Scott's maiden name "Hiatt" and that he once had a date at the Hyatt.  *Id.* at 43–46 (77:19–80:4).

- Mr. Yoder's fall 2017 statements to Ms. Scott's bus riders that he was going to ask to change her pick-up times.  *Id.* at 66–67 (100:15–101:12).

- March 2018 incident where Mr. Yoder came up within "an inch behind" Ms. Scott as she walked through the employee breakroom, flicked her purse strap off her shoulder, and asked her how far it was to her house. *Id.* at 28–31, 116–123 (60:8–63:20, 152:3–159:5).

- Mr. Yoder's April 2018 statements to Ms. Scott's bus rides calling her "an idiot" who didn't "know how to drive" and who "break[s] the rules by letting kids stand up while her bus is moving." *Id.* at 34 (66:1–23).

MCS contends that it has no liability because (a) Mr. Yoder's behavior was not "severe or pervasive" conduct that altered the terms and conditions of employment and (b) MCS did not act negligently in response to Mr. Yoder's behavior. Dkt. 47 at 30–32, 33–34. Ms. Scott did not respond to either argument. *See* dkt. 55.

### a. Severe or Pervasive Conduct

To meet this element of a hostile work environment claim, a workplace must be "so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). The behavior need not make the workplace "hellish." *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007). But it must be more than "offhand comments[] and isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S.

18

775, 788 (1998).  The conduct at issue "must be extreme to amount to a change in the terms and conditions of employment."  *Id.*

When determining whether workplace discrimination is extreme enough to create a hostile work environment, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017) (quoting *Harris*, 510 U.S. at 23).  No single factor is determinative.  *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).  Rather, the Court must "look to the totality of the circumstance[s] and ask whether everything together constitutes a hostile or abusive environment."  *Id.*

Here, no reasonable jury could find that that Mr. Yoder's conduct was severe or pervasive enough to alter the terms and conditions of Ms. Scott's employment.  First, Mr. Yoder's conduct was relatively "isolated and sporadic," occurring at varying times across the course of eight months.  *See Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002).  Second, the Seventh Circuit has found comments more sexually explicit and offensive than those attributed to Mr. Yoder insufficient to create a hostile work environment.  *See, e.g.*, *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009) (holding that supervisor's inappropriate comments to female employee that she "was 'made for the back seat of a car' and looked like a 'dyke,'" were "not objectively severe or pervasive").  And third, Ms. Scott has not designated evidence that Mr.

19

Yoder's behavior unreasonably interfered with her work performance.   *See* dkt.
55; *Alamo*, 864 F.3d at 549–50.

The Court understands that Ms. Scott felt threatened when Mr. Yoder
drove by and told her it was a "[n]ice day to run someone over," dkt. 45-1 at 24,
26, 61–62 (56:12–18, 58:7–12, 95:22–96:3), and that Mr. Yoder once flicked her
purse off her shoulder, *id.* at 28–31, 116–123 (60:8–63:20, 152:3–159:5).   Yet
these incidents do not resemble cases finding hostile work environments based
on physical threats, and Ms. Scott has not identified any on-point cases.   *Cf.*
*Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 635–36 (7th Cir. 2009)
(harassment included repeated use of noose and implied threats of physical
violence); *Taylor v. Metro. Water Reclamation Dist. of Greater Chicago*, No. 15-
CV-7855, 2020 WL 1503642, at *11 (N.D. Ill. Mar. 30, 2020) (threat to kill
Plaintiff, chest-bumping her, backing her into a corner while screaming at her).

Therefore, when viewed together, no reasonable jury could find from the
designate evidence that Mr. Yoder's conduct was sufficiently "severe or
pervasive" to create a hostile work environment.   *See Abrego*, 907 F.3d at 1015.

### b. Negligence in Controlling Working Conditions

But even if Ms. Scott had designated evidence that allowed a reasonable
inference of severe or pervasive conduct, MCS would nonetheless be entitled to
summary judgment because Ms. Scott has not designated evidence showing
that MCS was negligent in controlling working conditions with respect to Mr.
Yoder.   Under Title VII, "[i]f the harassing employee is a co-worker, a negligence
standard applies."   *Vance*, 570 U.S. at 453.   "To satisfy that standard, the

complainant must show that the employer knew or should have known of the offensive conduct but failed to take appropriate corrective action." *Id.* at 453–54; *see Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004); 29 C.F.R. § 1604.11(d).  Under this standard, a plaintiff can offer "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Vance*, 570 U.S. at 449; *see Wyninger*, 361 F.3d at 976.

Ms. Scott has not designated evidence that MCS failed to monitor the workplace. *See* dkt. 55.  All of Mr. Yoder's alleged behavior happened in front of other coworkers or students, and MCS monitored Ms. Scott's school bus through video surveillance. *See* dkt. 45-1 at 21–22, 24, 61–62 (Scott Dep. 53:23–54:6, 56:12–18, 95:22–96:3) ("Twinkie" and engine-revving incidents occurred with Ms. Hayes); *id.* at 43 (77:19–25) (Hyatt incident in front of another coworker); *id.* at 34 (66:1–23) (Mr. Yoder's criticism of her driving made to students); *id.* at 105–07 (141:12–143:15) (Mr. Yoder's questions about her salary and address occurred in front of several coworkers); dkt. 45-10 (Bus Video).

Ms. Scott has also not argued that MCS' complaint system was inadequate. *See* dkt. 55.  She registered her complaints about Mr. Yoder with her MCS supervisors, and MCS responded by meeting with her four times about the incidents over the following three months. *See* dkt. 45-1 at 21 (Scott Dep. 53:5–9) (March 12, 2018 complaint to Mr. Khalouf); *id.* at 36 (68:1–13)

(April 3 complaint to Mr. Khalouf); *id.* at 49–50 (83:18–84:13) (April 19 complaint meeting with Mr. Khalouf and Ms. Preston); *id.* at 138–39 (Scott Dep. 177:4–178:22) (May 7 complaint meeting with Mr. Khalouf and Ms. Preston).

And Ms. Scott has not designated any evidence that MCS discouraged complaints or did not effectively or promptly investigate her claims.  Indeed, each time Ms. Scott reported Mr. Yoder's behavior, MCS acted within weeks to address the situation.  *See Vance v. Ball State Univ.*, 646 F.3d 461, 466, 471–73 (7th Cir. 2011) (holding written warning issued 46 days after first complaint was "prompt"), *aff'd*, 570 U.S. 421 (2013); dkt. 45-6 at 2 ¶ 8 (Khalouf Aff.) (April 3 meeting with Mr. Yoder); *id.* at 3 ¶¶ 10–11 (investigation of Ms. Scott's complaint); *id.* at 3 ¶ 12 (April 10 meeting with Mr. Yoder).  And after asking Ms. Scott for witnesses, MCS met with Ms. Hayes—the one witness provided by Ms. Scott—but could not substantiate her claims.  *See* dkt. 45-7 at 1–4 ¶¶ 6–9 (Preston Aff.), 29–32 (April 23 meeting with Mr. Yoder and April 27 meeting with Ms. Hayes).

Finally, Ms. Scott has not argued or designated evidence that MCS' response to her complaints was not reasonably calculated to prevent further harassment.  *See* dkt. 55.  MCS had not received complaints about Mr. Yoder "behaving inappropriately or discriminatorily toward a female coworker because of her sex" before Ms. Scott's March 12, 2018 complaint.  Dkt. 45-6 at 2 ¶ 6 (Khalouf Aff.); dkt. 45-7 at 2 ¶ 7 (Preston Aff.); dkt. 45-1 at 21 (Scott Dep. 53:5–9).  And there is no designated evidence that Mr. Yoder failed to comply with Mr. Khalouf's April 3, 2018 instruction to stay away from Ms. Scott.  *See*

dkt. 45-6 at 2 ¶ 8 (Khalouf Aff.).  Ms. Scott does not allege that Mr. Yoder harassed her after the April 3 meeting.  *See, e.g.*, dkt. 45-1 at 148 (Scott Dep. 194:9–15).  Therefore, because Ms. Scott has not designated evidence that MCS' actions here were an unreasonable response to Mr. Yoder's alleged behavior, she has not shown that MCS acted negligently.

In a surreply, Ms. Scott offers "affidavits" from former MCS employee David Chapman and herself to show that MCS had notice of Mr. Yoder's behavior towards women before her complaints.  *See* dkt. 57.  MCS has moved to strike this surreply.  *See* dkt. 58.

Ms. Scott's surreply was inappropriate because MCS did not "cite[] new evidence in the reply or object[] to the admissibility of the evidence cited in the response."  *See* S.D. Ind. L. R. 56-1(d).  And the Court will not consider evidence in a surreply that does not respond to new evidence or arguments because that evidence could have been designated with the response to the motion.  *See Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 838 (S.D. Ind. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015).

Moreover, neither statement complies with Rule 56's requirements for affidavits or declarations.  *See* Fed. R. Civ. P. 56(c)(4).  They are not "affidavits" because they were not sworn "in the presence of someone authorized to administer oaths."  *Owens v. Hinsley*, 635 F.3d 950, 954 (7th Cir. 2011).  And they are not "declarations" because they do not comply with 28 U.S.C. § 1746, which sets forth the requirements for verification under penalty of perjury.  *See*

Fed. R. Civ. P. 56(c)(4) Advisory Committee's Note to 2010 Amendment; *Kallal v. CIBA Vision Corp.*, 779 F.3d 443, 446 (7th Cir. 2015); *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013) (holding that "[i]nclusion of the language 'under penalty of perjury' is an integral requirement of the statute"). Therefore, these additional statements cannot aid Ms. Scott's hostile work environment claim.[3]

Because Ms. Scott has not designated evidence that MCS acted negligently in responding to Mr. Yoder's behavior, a reasonable jury could not rule in her favor on her hostile work environment claim. As a result, MCS is entitled to summary judgment.

### IV.
### Conclusion

For the reasons discussed above, MCS' motion for summary judgment, dkt. [45], and its motion to strike, dkt. [58] are **GRANTED**. Its other motion to strike, dkt. [62], is **DENIED as moot**. Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 3/30/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana

---

[3] Even if these statements could be considered, their content would not alter the Court's conclusion that Ms. Scott has not designated evidence that MCS acted negligently in response to Mr. Yoder's conduct. *See Wyninger*, 361 F.3d at 976 (requiring plaintiff to show that employer "failed to take reasonable steps to remedy the harassment once it was on notice.").

Distribution:

SUSAN SCOTT
203 W. Howard Street
Sims, IN 46986

Brent R. Borg
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
bborg@cchalaw.com

Kevin S. Smith
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
ksmith@cchalaw.com